UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

COMPUWARE CORPORATION,

        Plaintiff,

        v.                                 Case No. 03-C-429

INNOVATEC COMMUNICATIONS, LLC,
SILVER SPRING NETWORKS, INC.,
ST. ANDREWS ACQUISITION, LLC,
JVB PROPERTIES, LLLP, KEITH V. BURGE,
JACK THOMPSON, and KEVIN SHEPARD,

        Defendants.

_____

ORDER

      On October 31, 2003, Compuware Corporation ("Compuware") filed an amended complaint against the named defendants alleging 14 claims for relief. Compuware contends the defendants owe it money for services it performed for defendant Innovatec Communications, LLC ("Innovatec") prior to Innovatec's dissolution in June 2002. Compuware reached a settlement with Innovatec and defendant Keith Burge, its former CEO, and as of July 2004, only 6 of the 14 claims in the amended complaint remained. The remaining claims are as follow: The eighth claim for relief against defendants Kevin Shepherd, improperly denominated in plaintiff's amended complaint as "Kevin Shepard" and changed in this decision to Shepherd, JVB Properties, Jack Thompson, and Silver Spring

Networks, alleges these defendants engaged in a civil conspiracy to have Burge breach his fiduciary duties to Compuware, in its capacity as a creditor, as well as to fraudulently transfer Innovatec's property to evade having to pay Compuware for its software service.

The other claims are solely against Silver Spring Networks. The ninth, tenth, and eleventh claims for relief are for actual, constructive, and insider fraudulent transfers under Chapter 242 of the Wisconsin Statutes. The twelfth claim for relief is for unjust enrichment under Wisconsin law. The thirteenth claim for relief is for a declaratory judgment that Silver Spring Networks is a successor to Innovatec and liable for its financial liabilities.

The remaining defendants have moved for summary judgment pursuant to Fed. R. Civ. P 56(c). The motion is fully briefed, and for the reasons that follow, the court will grant the motion.

FACTUAL BACKGROUND

Innovatec was founded in 1993 to develop an Automatic Meter Reading ("AMR") product that would, among other things, enable utility companies to read meters remotely and integrate meter reading and billing procedures. The ARM product had two principal components: the hardware consisted of a two-way telecommunications system to send signals back and forth between utilities and meters at customer locations; the software enabled the utilities to integrate and

use the collected data. Compuware provided Innovatec with the software services, and specifically, it developed software to act as the engine to integrate the collected data. The software was crucial to successfully marketing the AMR product.

In 1999, Innovatec, LLC was formed as a Wisconsin limited liability company to serve as the vehicle to raise capital for the AMR product. During that year, Innovatec retained Shepherd Financial, an Illinois-based investment banking firm and broker dealer, to help raise capital. Shepherd sold equity interests in Innovatec through private placements during 1999 and 2000, and in doing so, it raised approximately $11.6 million by the completion of the offering in the fall of 2000. By this time, Innovatec, Inc. owned a portion of the equity in Innovatec, and approximately 200 private placement investors owned the rest.

John Burke invested $2 million in the private placement and this made him the largest private investor. In the fall of 2000, Burke approached another investor, Keith Burge, who had invested $100,000, and asked him to join Innovatec's Board of Directors. Burge declined but later agreed to be Innovatec's interim President and CEO. In this new role, which commenced on January 11, 2000, Burge focused on raising new equity capital and finding a permanent CEO for Innovatec.

On January 11, 2000, Associated Bank, N.A. made a $1 million loan to Innovatec secured by all of Innovatec's physical property and accounts receivable. The security agreement was perfected by filing a UCC Financing Statement with the Wisconsin Department of Financial Institutions on January 31, 2001. On June 27, 2001, Associated Bank made an additional $100,000 loan to Innovatec, and Innovatec and Associated Bank signed a Patent Security Agreement which granted the bank a security interest in all of Innovatec's intellectual property. Under its terms, the agreement secured Innovatec's entire $1.1 million obligation to Associated Bank. Associated Bank made these loans to Innovatec as an accommodation to Burke, a long-time customer, and it would not have made the loans without Burke's personal guarantee. Burke personally guaranteed the entire principal and interest on the loans, and Eric Dresselhuys, Kimbel Nao, and Lance Ehrke each guaranteed $250,000. The maturity date on the loans was July 11, 2001.

By the first half of 2001, Innovatec was having serious problems paying its creditors. In July 2001, Burge informed Compuware's regional manager that Innovatec was unable to pay the more than $500,000 in unpaid invoices and that it would do so as soon as it received equity funding or generated some sort of cash flow. Burge offered on several occasions to convert Compuware's receivables into equity, but Compuware refused such offers, principally because Compuware did

-4-

not believe equity in Innovatec had market value. Innovatec was also not current on its interest payments to Associated Bank. This situation prompted Associated Bank to send the guarantors of the loan as well as the Chairman of Innovatec's Board a certified letter demanding repayment in full of the principal and interest on the loans. In response, Burke asked Associated Bank to forbear the exercise of its rights under the loan documents, and the bank obliged.

In the later part of 2001, Burge approached Jack Thompson, a Denver businessman, and convinced Thompson to make a $1.0 million secured loan to Innovatec through JVB Properties, LLLP ("JVB"), the investment vehicle for the loan. The loan was made on November 9, 2001, and it was secured by all of Innovatec's property under a general business security agreement which was perfected by the filing of a UCC Financing Statement with the Wisconsin Department of Financial Institutions on December 31, 2001. Thompson also personally purchased 8,333 shares of stock in Innovatec from Donn Dresselhuys thereby acquiring a minority interest (less than 10%) in Innovatec Corp.

Shortly after JVB's loan, Thomas Schwalm made a $1 million loan to Innovatec. Schwalm's loan also was secured by Innovatec's property, and he perfected his security interest by filing a UCC Financing Statement with the Wisconsin Department of Financial Institutions on December 11, 2001. JVB's

-5-

and Schwalm's loans helped Innovatec meet most of its payroll obligations for the balance of 2001 and the early part of 2002. The loans also enabled Innovatec to make its interest payments to Associated Bank. This change in circumstances caused Associated Bank to extend the maturity date of its loans to June 1, 2002.

Innovatec's cash-flow problems did not abate for long, however. It failed to keep current on its interest payments to Associated Bank, and it made no payments toward the principal balances of either loan. Despite its efforts to do so, Innovatec was unable to create an AMR system which was commercially viable for large-scale use by utility companies, and it never sold a complete system for large-scale use.

By December 2001, Compuware's invoices totaled $1.7 million, and in an effort to bring the situation under control, Compuware and Innovatec agreed to a payment plan. Under its terms, Innovatec agreed to (1) pay Compuware $50,000 upon the closing of certain bridge financing; (2) to make future payments according to a specified schedule if Innovatec obtained additional equity capital from a third party; and (3) keep current on any new invoices.

Innovatec never made good on its obligations under the payment plan. It did make the initial $50,000 payment and paid Compuware's December 1, 2001 invoice, but it failed to make all other scheduled payments or keep current on

-6-

invoices. In early June 2002, Compuware removed its personnel from Innovatec and ceased performing work on the AMR project.

Burge worked nearly full-time between January 11, 2001, and June 2002, to secure equity financing for Innovatec, but to no avail. Innovatec had virtually no sales during this time period. Burge and Dresselhuys worked without pay for much of 2002, and other employees were laid off or forced to take unpaid leaves. On June 3, 2002, Burge and Shepherd talked about bankruptcy proceedings, but they concluded it was not a viable option because Innovatec was out of money.

At the end of June 2002, Burge met with Innovatec's lawyer. Burge explained Innovatec was out of cash, there were no potential equity investors, the Associated Bank loans were in default, and Compuware would not convert its receivables to equity. Burge was told the gig was up and that he should immediately contact Innovatec's secured creditors, in order of priority, and report Innovatec's situation. Burge was also advised to surrender Innovatec's property to Associated Bank upon receipt of the bank's demand. Burge explained Innovatec had one remaining source of funds from Park Bank, but he was advised not to take on more debt. Burge conceded he could have drawn on more bank financing and postponed the acceleration of the loans with Associated Bank.

-7-

On June 10, 2002, Associated Bank sent a written notice to Innovatec and its loan guarantors that it was calling Innovatec's loans, and it demanded Innovatec pay the outstanding principal and interest due on the loans. Between June 10 and 18, 2002, lawyers for Associated Bank and Innovatec negotiated the terms of the surrender of Innovatec's assets.

A few days after June 10, 2002, Burge had a conversation with Shepherd in which they talked about structuring a low profile public sale. Thompson had a potential interest in bidding on Innovatec's property and was concerned if there were a large publication that customers would see and competitors would see, it would impugn his ability to build a new company.

On or about June 14, 2002, Associated Bank engaged David Gerlach of the Gerlach Companies to promote and conduct a public auction of Innovatec's assets. Gerlach, an attorney who worked continuously in the auction and appraisal business since 1965, had conducted between 20 to 25 auctions per year. After being retained, Gerlach requested Innovatec provide the identity of Innovatec's secured and unsecured creditors, its competitors, and contacts in the investment community. Innovatec contends it provided Gerlach with the information he requested, and in the course of providing this information, it furnished a list of

-8-

competitors who might be prospective buyers.  Six months later, the newly formed

Silver Spring Networks identified a list with more competitors.

On June 18, 2002, Innovatec and Associated Bank executed a Liquidation

Agreement and a Voluntary Surrender of Collateral in favor of Associated Bank.

That same day, Scott Grady, Associated Bank's outside counsel, sent a Notice of

Disposition of Collateral to all of Innovatec's secured creditors and guarantors via

certified mail and to all of Innovatec's unsecured creditors via regular mail.

Grady's secretary, Christine Somers, signed an affidavit of mail confirming she

mailed the notice to the unsecured creditors.  Grady's notice identified the date

(June 28, 2002) and location of the auction, gave a description of Innovatec's

assets, and provided contact information for potential bidders who wished to

obtain more information about the company and the sale.  Similarly, Gerlach sent

notice of the sale along with a description of Innovatec's assets to all of

Innovatec's secured and unsecured creditors, competitors, and investment

contacts.  Furthermore, Gerlach advertised the auction in the *Milwaukee Journal

Sentinel*, the *Wisconsin State Journal*, the *Chicago Tribune*, and *Wall Street Journal*,

and certain trade publications.  Finally, Grady and Gerlach sent notices of the

auction to Compuware's Milwaukee office–the address Compuware's contract with

Innovatec specifically required all notices arising under the contract be sent.

-9-

Grady and Gerlach received inquiries about the auction from throughout the United States and Europe. Grady and Gerlach encouraged interested bidders to contact Innovatec to learn more about the company and its assets.

Grady and Gerlach testified Innovatec and its management cooperated with Gerlach and Associated Bank, and in their opinion, Innovatec's management made a good faith effort to help Associated Bank maximize the price that could be achieved at the auction. In addition, both testified no one made any request or otherwise engaged in any conduct which would have limited the notice of the auction, reduced the number of potential bidders, or otherwise impeded Associated Bank's efforts to promote the auction. Both testified they were instructed to obtain the highest price possible for Innovatec's assets.

On June 20, 2002, Burge met with Shepherd and Thompson in Denver, Colorado, to discuss Innovatec's situation. Burge explained Innovatec was going bankrupt and was unable to pay its bills. Thompson said he would be interested in bidding on Innovatec's assets if Burge would become a part of a new organization. Thompson said he otherwise had no interest in bidding on the property because if Burge were not associated with the new organization, it made more sense to take his lumps and chance losing his $1 million secured loan. During the meeting, Shepherd, Thompson, and Burge reasoned the only way they

-10-

would have a chance of making something happen with the Innovatec property was to retain a lot of talent. Burge explained Innovatec had very limited hard assets and he deemed the company's soft assets, *i.e.*, its "know-how" and "intellectual property" in the heads of its employees, as its primary source of value.

In a letter dated June 20, 2002, Burge communicated his thoughts to Thompson and Shepherd regarding what it would take to form a new company with Innovatec's property, and he identified key Innovatec employees he would want to hire and proposed the terms under which he would be willing to participate. According to Shepherd, the letter was a pretty good summary of the discussion that took place at the Denver meeting, and it contained the following:

> ! the need for a solid gameplan on how to proceed. If no one bids more than $2.2M, then Thompson will have 100% of the company for $1.2M.
> ! Under such a scenario, shares valued at $1.25 would provide a market cap of $24.5M which would be justified for Innovatec with the contracts in place and a balance sheet with no debt. JVB would have 61% ownership valued at $15M which is 7 times the approximate $2M invested. The equity would need to be raised at $1.00/share which would lower the market cap to $19M and JVB's value to $12M.
> ! Burge would be willing to continue as CEO through the equity raise, and in the Fall, he would be looking to transition the CEO role to Shrader and continue as either Chairman or a very active board member. He needed an annual salary of $150K

-11-

> per year, a $50K bonus paid at the completion of successfully raising the equity, and approximately 6% of the company.

Thompson and Shepherd had additional discussions on the matter and decided JVB should bid up to $2.2 million for Innovatec's property. Thompson and Shepherd reasoned by bidding $2.2 million, Associated Bank would be paid in full, and JVB would own Innovatec's property and be in a position to finish developing the AMR system. Thompson and Shepherd further reasoned by bidding no more than $2.2 million, JVB would recoup its secured loan in the amount of $1.0 million.

Between June 20 and 25, 2002, JVB's lawyers contacted Grady to obtain more information about the auction. Grady recommended JVB hire a lawyer in Wisconsin, and JVB did so. In the final days prior to the auction, JVB's Wisconsin lawyer contacted Grady and negotiated over the terms under which Associated Bank would consider selling JVB its loan rights. On June 27, 2002, Associated Bank sold its loan rights for the total principal amount of the loans plus interest and costs. Neither Burge nor any other representative of Innovatec participated in these negotiations. Burge testified he was unaware the negotiations were taking place and did not know what action, if any, Thompson, JVB, or any affiliated entity would take with respect to the Innovatec assets.

-12-

On June 27, 2002, JVB's Wisconsin and Colorado lawyers created St. Andrews Acquisition, LLC, as a Wisconsin limited liability company to act as the vehicle for JVB to acquire Associated Bank's rights under the loan. JVB was the sole member of St. Andrews. Associated Bank and St. Andrews executed a Loan Purchase Assignment Agreement at a closing conducted the morning of June 28, 2002.

On June 28, 2002, Gerlach conducted the auction. At the start of the auction, Grady announced St. Andrews had purchased Associated Bank's loan rights and that the auction would go forward as scheduled. The fact that St. Andrews acquired the loans from Associated Bank was announced to the participants. All the work and preparation for the auction was completed by or under the direction of Associated Bank. Grady testified the auction would have been conducted in exactly the same manner if Associated Bank had remained the seller rather than St. Andrews.

About 12 bidders registered for the auction, and St. Andrews opened with a credit bid of $1.2 million. Gerlach took a break after St. Andrews' bid, and after the break, Gerlach solicited additional bids, but no other bidder submitted a bid. As a result, St. Andrews formally acquired Innovatec's assets. Later that afternoon, Shepherd gave Burge permission to begin building a team.

-13-

On July 3, 2002, JVB's lawyer formed Real Time Tech Com ("Real Time") as a Delaware corporation, and Burge and Dresselhuys were appointed directors along with Brian London, a representative of Thompson. Initially, JVB was the sole shareholder of Real Time, and in exchange for Real Time's stock, JVB contributed 100% of its interest as the sole member of St. Andrews. Shortly thereafter, Burge was retained to act as Real Time's president and CEO and to assemble a team to run the company. Burge extended job offers to some former Innovatec employees he believed would be capable of helping Real Time complete product development and he began marketing.

In July and August 2002, Real Time raised additional capital to fund its operations. Tom Schwalm, the secured creditor in the third position vis-a-vis Innovatec, purchased stock in Real Time in exchange for a cash contribution of $500,000, through an entity known as Boldt, LLC. Real Time changed its name to Silver Spring Networks, Inc., during that time period.

From July 2002 through January 2003, a group of investors, which included some former members of Innovatec, contributed an additional $450,000 in exchange for stock in Silver Spring Networks. In August and September 2002, St. Andrews assigned its assets, including the intellectual property formerly owned by Innovatec, to Silver Spring.

-14-

At the time of the filing of this lawsuit, JVB owned approximately 75% of the outstanding stock in Silver Springs. Boldt owned approximately 13%, and other investors the remaining 12%. In addition, former Innovatec members owned approximately 9% of the outstanding stock of Silver Spring, and neither Innovatec Corp., nor Innovatec, nor any investor in those two entities received any Silver Spring stock in exchange for any interest formerly held in those entities. As a result, Silver Spring Networks was controlled by JVB. No officer, director, employee, or member of Innovatec ever owned any interest in JVB or St. Andrews.

On July 8, 2002, Silver Spring was in operation. Thirteen of its employees were former Innovatec employees. Burge and Dresselhuys constituted two of the three executive level employees. The third was Shrader, an Innovatec consultant. The four operational managers at Silver Spring were former Innovatec operational managers. The managers performed the same basic duties at Silver Spring Networks as they had at Innovatec. Silver Spring retained three of Innovatec's four largest customers and continued service to SDG&E without interruption in service as a result of the transfer from Innovatec.

In its September 2002 executive summary, a brochure for potential investors, Silver Spring represented, "Silver Spring Networks is recognized as the technology leader." It made this representation although it had only been in

-15-

business for less than 90 days.  It took credit for Innovatec's technology and touted Innovatec's customer relationships.  It went on to say it was in the process of finalizing agreements with SDG&E, a long time customer of Innovatec, "in light of our reorganization."  In discussing the stock option plan for Silver Spring's employees in the fall of 2002, Burge stated:

> . . . . we . . . have put in order an adder for the people who had been with us over the past two years and hung in there during the difficult period.  There are little extra options granted to both Dennis Nuegent and Greg Gozdowiak, both high level managers . . . because they had forgone . . . pay in the fall of last year to keep the asset alive.

Thereafter, Silver Spring continued to represent itself as a continuation of Innovatec in its January 2003 Confidential Business Plan when, in the course of discussing the background of Dresselhuys, it was referred to Innovatec as the predecessor of Silver Spring Networks. As late as August 2004, the www.innovatec.com domain name was still in use, and was one of the domain names of Silver Spring's website–with Innovatec.com showing in the address bar without redirecting the visitor to a new site.  Moreover, the Innovatec website continued to be up as late as five months after the asset sale.

## DISCUSSION

Compuware's eighth claim for relief against defendants Shepherd, JVB, Thompson, and Silver Spring Networks for civil conspiracy is not supported by

-16-

the evidence or law. Compuware alleges these defendants conspired with Burge to have Burge breach his fiduciary obligations to Compuware and other creditors for the purposes of effectuating a fraudulent transfer of Innovatec's property. Compuware alleges Burge and the others did this to avoid paying Compuware for its software services. For the reasons that follow, the court must grant summary judgment in favor of the defendants on this claim for relief.

First, Compuware fails to show it has standing as a lone creditor to bring an action alleging Burge breached his fiduciary duties to Innovatec's creditors. In Wisconsin, a creditor may bring an action for breach of fiduciary duties against a director or officer of a corporation "only if the creditor suffers a single and exclusive injury resulting from a direct tort of the director or officer of the creditor." *McGivern v. Amasa Lumber Co.*, 252 N.W.2d 371, 379-80 (Wis. 1977). Here, Compuware fails to show it suffered any exclusive injury as a result of Burge's actions. As pointed out in its amended complaint, Burge's alleged breach of fiduciary duties injured all creditors, not just Compuware.

Second, Compuware fails to show it is entitled to seek recovery on behalf of all creditors injured by Burge's alleged breach of his fiduciary duties. In Wisconsin, a creditor may bring an action for breach of fiduciary duties only so long as the action is brought "on behalf of the corporation for the benefit of all its

-17-

creditors." *McGivern*, 252 N.W.2d at 379. Compuware's amended complaint alleges Burge's breach of fiduciary duties harmed Compuware as well as other creditors, but nowhere in the amended complaint does Compuware make plain its intent to seek relief "on behalf of the corporation for the benefit of all its creditors," *id.*, or "unsecured creditors generally." *Finch v. Southside Lincoln-Mercury, Inc.*, 685 N.W.2d 154, 168 (Wis. Ct. App. 2004). Moreover, the amended complaint fails to state "facts that would establish [its] authority to pursue the fiduciary duty claims in a representative capacity." *Id.* Because Compuware's breach of fiduciary claim is "brought solely on behalf of [itself] as an individual creditor of [Innovatec], [it] cannot go forward." *Id.*

Third, even if Compuware were able to show it has standing to bring a claim for breach of fiduciary duties (and it cannot) it nonetheless fails to establish the defendants engaged in a civil conspiracy to have Burge do so. In Wisconsin, a plaintiff establishes a civil conspiracy by showing (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts. *Bruner v. Heritage Cos.*, 593 N.W.2d 814, 818 (Wis. Ct. App. 1999). "Additionally, to form a conspiracy there must be an 'agreement to violate or disregard the law,' and the persons involved must 'knowingly be members of the conspiracy.'" *Id.* (quoting WI J I-Civil 2800).

-18-

Here, Compuware fails to show Burge, or anyone else for that matter, did anything to breach his fiduciary duties to Innovatec's unsecured creditors. "[A] fiduciary duty on the part of officers and directors is owed to a corporations's creditors [] only after the corporation is both insolvent and no longer a going concern." *Beloit Liquidating Trust v. Grade*, 677 N.W.2d 298, 310 (Wis. 2004). A corporation is insolvent if its assets, at a fair valuation, are insufficient to pay its debts. *Schmitz v. Wis. Soap Mfg. Co.*, 235 N.W. 409 (Wis. 1931). When the corporation is insolvent and no longer a going concern, its assets become a "trust fund, so directors may not prefer themselves over general creditors." *Beloit*, 677 N.W.2d at 309 (quoting *Hamilton v. Menominee Falls Quarry Co.*, 81 N.W 876 (Wis. 1900)). Under the circumstances, directors or officers may not "transfer corporate property to themselves in payment of debts due to them . . . ." *Slack v. Northwestern Nat'l Bank of Superior*, 79 N.W. 41 (Wis. 1899). It appears Innovatec was insolvent and no longer a going concern at the time it surrendered its property to Associated Bank, but the record fails to show Burge, as an Innovatec officer, did anything to violate his fiduciary duties to Innovatec's creditors. On the contrary, the evidence in the record shows as soon as Burge realized Innovatec was insolvent, he surrendered its property to Associated Bank, a secured creditor. There was nothing improper about Burge preferring Associated Bank, a secured

-19-

creditor, over Compuware, an unsecured creditor. *See, e.g., Keener Lumber Co. v. Perry*, 560 S.E.2d 817, 827 (N.C. App. 2002) (director may prefer secured over unsecured creditor). Moreover, the evidence fails to show Burge did anything improper after he surrendered Innovatec's property. There is no evidence, for instance, to show he transferred Innovatec property to himself or did anything to benefit himself at the expense of Innovatec's creditors. It is true he made plans for his future employment with one creditor, JVB, and not others creditors, but the court is unaware of Wisconsin authority to support the proposition that this constituted a breach of fiduciary duties.

Fourth, Compuware fails to show the defendants ever made an agreement to violate or disregard the law or took steps to further such an agreement. The court is obliged to point out that rather than crafting an argument linking citations in the record to the elements of a claim for civil conspiracy, Compuware's brief in opposition to summary judgment presents the court with several pages of bullet points which–as aptly described by the defendants–are "untethered to any requisite element of its conspiracy claim." This is a telltale sign of a losing argument. Perhaps Compuware hoped the court would take it upon itself to wade through the bullet points cobble together a set of facts establishing a *prima facie* case for civil conspiracy. The court, in fact, has made a fair effort to do so, and

-20-

despite its efforts, it is simply unable to conclude there is anything in the record to establish a civil conspiracy. Suffice it to say, the court is aware of nothing in the record to show the defendants did anything, either collectively or individually, to effect a fraudulent transfer of Innovatec's property or cause Burge to breach his fiduciary duties. As such, the court is obliged to grant summary judgment in favor of defendants on Compuware's eighth claim for relief.

Compuware's ninth, tenth, and eleventh claims for relief against Silver Spring for actual, constructive, and insider fraudulent transfer under Chapter 242 of the Wisconsin Statutes are not supported by the evidence. Section 242.04(1)(a) of the Wisconsin Statutes provides a transfer is fraudulent when a debtor transfers the property to hinder, delay, or defraud a creditor:

> A transfer made or obligations incurred by a debtor is fraudulent as to the creditor, whether the creditors claims arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a)     With actual intent to hinder, delay or defraud any creditor of the debtor . . . .

Wis. Stat. § 242.04(1)(a). Definitions first: The word "creditor" is defined as "a person who has a claim." Wis. Stat. § 242.01(4). The word "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable,

-21-

secured or unsecured." Wis. Stat. § 242.01(3). The word "debtor" is defined as "a person who is liable on a claim." Wis. Stat. § 242.01(6).[1]

The word "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payments of money, release, lease and creation of a lien or other encumbrance." Wis. Stat. § 242.01(12). The word "asset" is defined as "property of a debtor, but . . . not . . . to the extent it is encumbered by a valid lien." Wis. Stat. § 242.01(2). The word "property" is defined as "anything that may be the subject of ownership." Wis. Stat. § 242.01(10). The term "valid lien" is defined as "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." The word "lien" is defined within the Wisconsin Statutes as "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, judicial lien obtained by legal or equitable process or proceedings, a common-law lien or a statutory lien." Wis. Stat. § 242.01(8).

---

[1] The word "person" is defined by the Wisconsin Statutes as "an individual, partnership, corporation, limited liability company, association, organization, government or governmental subdivision or agency, business trust, estate, trust or any other legal or commercial entity." Wis. Stat. § 242.01(9).

-22-

Here, the evidence in the record fails to establish a "transfer" occurred within the meaning of § 242.04(1)(a) when Innovatec surrendered its property to Associated Bank or when Associated Bank sold Innovatec's property to St. Andrews. At the time Innovatec surrendered its property to Associated Bank, it was worth approximately $1.2 million, and the property was encumbered by valid liens totaling $3.1 million. As such, no "assets" were surrendered, and therefore no "transfer" occurred. *See e.g., Webster Indus. v. Northwood Doors, Inc.,* 320 F. Supp. 2d 821, 837 (N.D. Iowa) (property constitutes an asset under the Uniform Fraudulent Transfers Act only to the extent it is not encumbered by a valid lien); *see also Kellstrom Bros. Painting v. Carriage Works, Inc.,* 844 P.2d 221, 222 (Or. Ct. App. 1992); *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.,* 959 P.2d 1052, 1060 (Wash. 1998).

There can be no dispute that there were valid liens on Innovatec's property in the amount of $3.1 million at the time of its surrender. Associated Bank, JVB, and Schwalm each had perfected security interests, and these interests constitute valid liens. *Nova Chems., Inc. v. Frawley,* Case No. 02C3662, 2003 U.S. Dist. LEXIS 18421, at *16 (N.D. Ill. Oct. 20, 2003) (a perfected security interest is a valid lien within the meaning of the Uniform Fraudulent Transfer Act). In addition, there is no reason to adopt Compuware's contention that these liens

-23-

were placed on Innovatec's property for the purpose of perpetuating a fraudulent transfer as was in the case *Telephone Equipment Networks v. Ta/Westchase Place*, 80 S.W.3d 611 (Ct. App. Tex 2002). In *Telephone Equipment*, security interests were perfected only after a lawsuit was filed, and the interests were perfected by a sister-company formed by the debtor in an obvious effort to protect against an anticipated judgment. In this case, the security interests were perfected long before Innovatec defaulted on its loans, and the security interests were perfected by persons other than Innovatec or companies formed by Innovatec. Thus, *Telephone Equipment* simply does not permit an inference that the liens were fraudulently established in this case.

It is also beyond dispute that the approximate value of Innovatec's property at the time it was surrendered to Associated Bank was $1.2 million. Innovatec's property sold at auction for $1.2 million 10 days after it was surrendered to Associated Bank, and that sales price is presumed to reflect the approximate value of the property 10 days earlier. *See Webster Indus.*, 320 F. Supp. 2d at 839 (sales price at auction presumed to reflect approximate value of property); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994) ("We deem, as the law always has deemed, that a fair and proper price, or a 'reasonably equivalent value,' for

-24-

foreclosed property is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.").

In addition, nothing in the record rebuts the presumption that Innovatec's property was worth approximately $1.2 million. Compuware's allegations that the auction was fixed in a way that permitted St. Andrews to purchase the property below its actual market value finds no support in the record. Indeed, the sale of Innovatec's property appears to be a textbook example of an Article 9 foreclosure sale. After Innovatec defaulted on its loan to Associated Bank, the bank took possession of the collateral and disposed of it in a commercially reasonable manner–in this case, an auction. *See* Wis. Stat. §§ 409.609(1)(a), 409.610(1), (2). The auction was handled by a reputable and experienced auctioneer, and the evidence indicates in every way that the auction was conducted by the book. Compuware tries to poke holes in the auction process by suggesting the list of competitors Innovatec provided Gerlach was incomplete and that Gerlach did something untoward by not telling the other bidders who owned St. Andrews on the morning of the auction. However, Compuware fails to specifically point out which competitors should have been, but were not, included on the list, and it fails to explain how the disclosure of the owner of St. Andrews was a commercial necessity.

-25-

But perhaps more to the point, Compuware fails to show how conducting the auction in a different manner would have caused Innovatec's property to sell for a price greater than $1.2 million. Compuware makes no attempt to show, for instance, that any of the so-called competitors allegedly left off of the list would have purchased Innovatec's property for more than $1.2 million had they been on the list. Also, Compuware fails to explain how the announcement of St. Andrews' owner would have affected the price paid for Innovatec's property.

Compuware's expert's testimony also fails to rebut the presumption that Innovatec's property was worth approximately $1.2 million. Its expert opined Innovatec's property, when combined with the know-how of Innovatec's employees, was worth upwards of $5 million. But the property sold at the auction did not include the know-how of Innovatec's employees–it stood alone. Compuware maintains its expert's valuation is nonetheless correct because as of June 18, 2001, JVB was already formulating a plan to purchase the property at auction and complete the AMR project with former Innovatec employees. However, it is difficult to discern how JVB's intentions to do so affected the approximate valuation of Innovatec's property. The other 10 bidders at the auction certainly could have approached the auction with a similar game plan, and if they had, there is no reason to believe they would have paid more for the

property than St. Andrews did. After all, the former Innovatec employees did not work for St. Andrews for free, and there is no reason to believe these former Innovatec employees would have demanded a different level of compensation from someone other than JVB who purchased the property and offered to employ them.

But even if the surrender of Innovatec's property on June 18, 2001, *did* constitute a "transfer" (and it did not) the transfer is nonetheless not voidable under § 242.08(1), which reads in its entirety as follows:

> A transfer or obligation is not voidable under s. 242.04(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

Wis. Stat. § 242.08(1). There can be no dispute that Associated Bank took Innovatec's property in good faith and for good reason. After all, Innovatec was in default, had no cash flow or sales prospects, and could not pay its bills. Compuware seizes upon a hearsay-riddled statement by Lance Ehlke to the effect that it was Innovatec who told Associated Bank to call in the loan. Compuware never comes right out and states what this statement might prove, but perhaps it believes this constitutes evidence of some sort of orchestration between Innovatec and Associated Bank to call in the loan prematurely for the purpose of defrauding Innovatec's unsecured creditors. This tidbit of evidence does not permit such an inference, however. Assuming the statement would even be admissible, it shows

-27-

little more than Innovatec saw the writing on the wall, knew it had no realistic chance of paying Associated Bank, and decided to inform the bank there was no reason to delay calling in the loan.

It also is beyond dispute that Associated Bank took the collateral "for a reasonable equivalent value." After all, the court has already determined the approximate value of Innovatec's property was $1.2 million as of June 18, 2001, whereas the value of Associated Bank's secured interest was $1.1 million. To be sure, $1.2 million is the reasonable equivalent of $1.1 million.

Moving along, the evidence in the record also fails to establish Associated Bank's sale of Innovatec's property to St. Andrews constituted a "transfer" for the same the reason the surrender of Innovatec's property to Associated Bank did not constitute a "transfer." And even if there were a "transfer," (and there was none) the transfer could not be voided pursuant to § 242.08(1) because St. Andrews was a "subsequent transferee" within the meaning of that provision.

Finally, the transfer of Innovatec's property by St. Andrews to Silver Spring did not violate § 242.04(1)(a) because St. Andrews was not a "debtor" within the meaning of that provision. St. Andrews purchased the property through an Article 9 foreclosure, and it therefore acquired the property free and clear of Innovatec's liabilities. *See, e.g., R.J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277,

-28-

279-83 (10th Cir. 1977) (purchaser of corporation's assets by credit bid at public foreclosure sale not liable for corporation's debts and liabilities).   In addition, Compuware does not contend St. Andrews is a successor of Innovatec and therefore liable for its debts.  But even if St. Andrews were somehow a debtor (and it was not), it was a subsequent transferee within the meaning of § 242.08(1), the transfer of the property therefore could not be voided.   For all these reasons, Compuware cannot establish a violation of § 242.04(1)(a).

Compuware similarly fails to establish violations of §§ 242.05(1), (2) for constructive and insider fraudulent transfers.  Sections 242.05(1) and (2) provide as follows:

> (1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claims arise before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for a transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

> (2) A transfer made by a debtor is fraudulent as to a creditor whose claims arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

Wis. Stat. §§ 242.05(1), (2).  As already discussed, Compuware fails to show a "transfer" occurred when Innovatec surrendered its property to Associated Bank

-29-

or when Associated Bank sold Innovatec's property to St. Andrews. In addition, Compuware fails to show St. Andrews' transfer of Innovatec's former property to Silver Spring violated either section because, as already discussed, St. Andrews was not a "debtor." For all these reasons, Compuware cannot establish violations of §§ 242.05(1), (2). As such, the court is obliged to grant summary judgment in favor of Silver Spring Networks on Compuware's ninth, tenth, and eleventh claims.

Compuware's twelfth claim for relief against Silver Spring Networks for unjust enrichment is not supported by the evidence. To prevail on a claim for unjust enrichment at the summary judgment stage, Compuware must show (1) it conferred a benefit upon Silver Spring Networks, (2) Silver Spring Networks appreciated or had knowledge of the benefit; and (3) under the circumstances, it is inequitable for Silver Spring Networks to accept or retain the benefit. *Tri-State Mech., Inc. v. Northland College.*, 681 N.W.2d 302, 306 (Wis. Ct. App. 2004).

Here, the evidence in the record fails to establish Compuware conferred a benefit on Silver Spring. It is true, as Compuware points out, that Silver Spring Networks may have indirectly benefitted from Compuware's software services when it acquired Innovatec's former property, but "[a] person who has conferred a benefit upon another as the performance of a contract with a third person is not

-30-

entitled to restitution from the other merely because of the failure of performance by the third person."  Restatement of Restitution § 110 (1937); *see e.g., DCB Constr. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 121 (Colo. 1998).  As such, Compuware is not entitled to restitution from Silver Spring, the current owner of Innovatec's property, simply because Innovatec failed to pay Compuware for its software services.  In light of the foregoing, the court is obliged to grant summary judgment in favor of Silver Spring on Compuware's twelfth claim for relief.

Finally, Compuware's thirteenth claim for relief against Silver Spring Networks for a declaration that Silver Spring is the successor of Innovatec and therefore liable for its debts is not supported by the evidence.  In Wisconsin, the general rule is a corporation who purchases the assets of another corporation does not succeed to the liability of the selling corporation.  *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 661 N.W.2d 776, 784 (Wis. 2003).  However, there are four exceptions to this general rule.  A corporation that purchases the assets of another *will* succeed to the liability of the selling corporation when (1) the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability; (2) the transaction amounts to a consolidation or merger of the purchaser and seller corporations ("de facto merger"); (3) the purchasing corporation constitutes a continuation of the selling corporation; and (4) the asset sale is

-31-

conducted fraudulently to enable the seller to escape liability for its obligations. *Id.*; *Fish v. Amsted Indus.*, 376 N.W.2d 820, 823 (Wis. 1985).

Here, the evidence fails to establish Silver Spring is Innovatec's successor under any exception. Silver Spring may have "touted" it was continuing Innovatec's work and had reassembled Innovatec's "team," but contrary to Compuware's contentions, this sort of self-promotion and identification does not constitute an implied promise to pay Innovatec's debts. Furthermore, Silver Spring cannot be said to be a mere continuation of Innovatec. "[T]he mere continuation exception requires . . . 'a common identity of officers, directors, and stock holders in [the] selling and purchasing corporation.'" *Gallenberg Equip. v. Agromac Int'l, Inc.*, 10 F. Supp. 2d 1050, 1053 (E.D. Wis. 1998) (quoting *Fish*, 376 N.W.2d at 824). The purpose of the exception is to prevent a corporation from merely "changing hats." *Gallenburg*, 10 F. Supp. 2d at 1054 (citing *Armour-Dial, Inc. v. Alkar Eng'g Corp.*, 479 F. Supp. 1198, 1201 (E.D. Wis. 1979)). Thus, the test is not whether the business operations continue but whether the purchaser is simply a continuation of the corporate entity of the seller. *Id.* Here, the evidence plainly shows Silver Spring has a materially different mix of owners, directors, and investors than Innovatec, and the two corporations cannot be said to have merely swapped hats. Finally, the sale of Innovatec's property was not a

-32-

mere shell game designed to enable Innovatec, through fraud, to escape liability for its obligations. On the contrary, the facts in this case are remarkably similar to those confronted in *Armour-Dial, Inc. v. Alkar Engineering Corp.*, 469 F. Supp. 1198, 1202 (E.D. Wis. 1979), where the court similarly concluded the facts did not support the claims of fraud. Like the corporation in *Armour-Dial*, Innovatec was clearly insolvent before it surrendered its property to Associated Bank, and the evidence shows Associated Bank took Innovatec's property in good faith and for reasonably equivalent value. Compuware all but conceded Innovatec was insolvent by suing Burge for breach of fiduciary duties–duties which arise only *after* a corporation becomes insolvent. Also, like the corporation in *Armour-Dial*, the evidence shows Innovatec had no control over the sale of its property at auction or that the auction was commercially unreasonable or resulted in Innovatec's property being sold for less than its market value. In short, the evidence fails to show Innovatec's property was fraudulently transferred to Silver Spring Networks so it could avoid paying Compuware, and therefore fails to show Silver Spring Networks was the successor of Innovatec and responsible for Innovatec's debts. As such, the court is obliged to grant summary judgment in favor of Silver Spring on Compuware's thirteenth claim for relief.

Accordingly,

-33-

IT IS ORDERED that the defendants' motion for summary judgment be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that Compuware's claims for relief against the defendants be and the same are hereby DENIED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED with prejudice.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this ___24th___ day of August, 2005.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge

-34-